The next case on the calendar is United States v. Garner. Your Honor, it's Monica Richards, United States, the appellant in this matter. This is a preliminary matter. Can I ask whether you tried the case? Oh, no sir, I did not. No, Your Honor, I did not. The case that's before the court now comes to the court on a motion for judgment of a will that the district court granted after a jurisdiction. The jury found and was instructed here with regard to the element of conspiracy and with regard to the buyer-seller exception to that countenance. The district court, I'm sorry, the jury rather, heard evidence of the dependent relationship between Mr. Garner and his distributor, who was Mr. Pacheco. Mr. Pacheco testified at the trial. The amounts that were involved here were significant amounts over a very short period of time. We had kilogram quantities of cocaine being exchanged between the two. The frequency... Wait a second. Wait a second. The jury found less than 500 grams. That was the jury's... So I know what your allegations were and what your proof was. But the jury found that the conspiracy involved, or reasonably found, that it was less than 500 grams, right? The jury made the finding that it was less than 500 grams, yes. All right. That would be 17.637 ounces, right? Wow. 500 grams... Oh, Your Honor. I'm sorry. I missed that. Take the next 10 minutes and figure it out. It would be 170 grams. Thanks. I appreciate that. Rick, I like your math better the second time, Your Honor. Yeah, I'm sorry. I didn't do well in school. But it found less than that, right? It found less than that, yes. So it could have found 400... The two transactions were... Two transactions, the June and the July transactions, were alleged to have been kilograms or more. And the first transaction was 2 to 3 ounces, right? 2 to 4 ounces, Your Honor, yes. Okay. Okay. So considering the fact that he buys in gram amounts, which was also testified to by Mr. Pacheco, the day that he met Mr. Garner, he was selling his own cousin a couple grams. So what is gram amounts or what is a normal user amount? What we're talking about here with 2 to 4 ounces is obviously considerably more than that and enough to further users' interest. Well, I'm not exactly sure what it is that that's proving. I want to know what evidence there is that this was something more than purchases and sales, which I gather is not enough under our law, at least under Brock and others, that just purchases and sales, I assume big ones, little ones, the fact that it's big may be background, a point towards a conspiracy, but that alone isn't enough, is it? I mean, if it's just the purchase and sale, that isn't enough. And if that's right, what is it here that suggests it's more than purchases and sales, but it is indeed a conspiracy? Well, the conspiracy, Your Honor, frankly, in the Brock case is distinguishable. It's distinguishable on a couple of reasons, but to say that there's just a buy and a sell doesn't mean that there's not a conspiracy. That is a conspiracy. Two people made an agreement, entered into it, and they bought and they sold for set amounts of drugs for a set amount of money and transferred a set amount of drugs. What turns it into a conspiracy? That is the definition of a conspiracy, Your Honor, frankly, and what's come about through the court system here and what's come about through cases like Brock and others is this concept that the buyer-seller is some sort of exception to it. The buyer-seller exception we know traditionally is meant to protect users, is meant to protect the transferees from the severe liabilities that are intended just for the transferors. But here what we have are two transferors. We have a distributor and we have a dealer. We have Pacheco, who's a distributor. We've got Garner, who's a dealer. Wasn't that true in Brock as well? In Brock, what we had, Your Honor, respectfully, was I don't understand the decision in Brock, to be truthful. Well, it's binding on this panel, so you better explain it to us. You better understand it or you'll, I mean, seriously. What I see in Brock, Your Honor, is we have the defendant there, his name was James Dickerson, and he was somebody who purchased a lot of drugs for sure, but he had multiple sources for his drugs. So he was a dealer with multiple distributors, and what they were tagging him with was the conspiracy charged among, there were multiple defendants, I'm sorry, I don't know the number, but multiple defendants in that case initially, and they were looping him into the conspiracy with that entire group of defendants. So you had Dickerson who stood up and said, no, wait a second, I was just a customer. I was just buying drugs from this one guy who's somewhere in the midst of this conspiracy, and I didn't know anybody else. They didn't care what I did with it. I don't care where they got it from. So there was no dependence. There was no mutual dependence in the sense that what we have here is Mr. Garner who was buying only from Mr. Pacheco. The evidence, as we had it at the trial, was demonstrated that Garner would supply Pacheco, I'm sorry, Pacheco would supply Garner rather, and that was his single source of supply in kilogram amounts. So what the evidence showed here... How many transactions are you talking about? Well, here, the interesting thing, is that Garner would supply Pacheco with transactions in a matter of weeks, a matter of about two and a half months at that, and that those transactions only stopped because the investigation was against Mr. Pacheco. The investigation for Pacheco resulted in Pacheco's arrest mid-August. How do you know they only stopped as a result of that? Because, well, there's demonstration, so they stopped because Mr. Pacheco was in jail. But then, after that, we had Mr. Garner and his, Mr. Pacheco's significant other, now an ex-girlfriend, but at that time, his girlfriend, gave her on two different occasions a significant amount of money, $5,000 on each of two occasions. The implication, as was argued to the jury here, that that was a continuation of the relationship, that Mr. Garner was doing what he could to help out Mr. Pacheco, that he wanted, for whatever the reasons were, we can't get inside Mr. Garner's head on that, but that significant amount of money is a reasonable inference to draw that he was hopeful that it would be... You know, in terms of the staggering amounts of money, we're talking about Jamestown, New York, which is a wonderful town, but it's not Chicago, it's staggering amounts of money. The notion that you're talking about $5,000 in this context as being huge, it strikes me as a little odd. I think I misheard, Your Honor. You're suggesting that that's not a huge amount? That $5,000 in the context of the amount of money that you're talking about in these transactions is not huge, that's what I'm suggesting, yes. Maybe I didn't speak properly then, but what I was saying was this was money that was just paid for no consideration after the date that Mr. Pacheco was jailed. Understood. Okay. So to have paid $10,000 is, as was argued to the jury again, in my opinion, is indicative of an intent to continue the relationship, and I hope the relationship would continue with Mr. Pacheco's release from jail. I thought it was also explained by the fact that he was trying to get Mr. Pacheco not to implicate him. It may have been a payoff for something else, but not necessarily part of the drug transaction. In terms of, again, we can't get inside Mr. Garner's head, but it's a fair inference to be drawn, Your Honor, that the payment of $10,000 after Mr. Pacheco's arrest without provision of any drugs in return was certainly something that demonstrated that Mr. Garner intended the relationship to continue. The... Sorry? Go ahead. I'm sorry. Excuse me. Do you have one more minute of your total seven? Thank you. What evidence was there that... What evidence... Did Garner ever get his drugs on credit from Pacheco? No. No, he did not. Garner did not. He had the cash ready... Pacheco testified, JA-664, that he didn't really care what Garner did with the drugs, right? Well, that's true, Your Honor, but that's the point. That can't be the reason that would insulate. That would mean in every instance that a drug distributor would just come before the court and say, I didn't know what he was doing with it. Well, your view is that Brock is wrong, and so your view is that any time that there's a... a buyer who buys a commercial quality from a seller, that that sale alone is a conspiracy because it's inherently commercial, right? But Brock's the law, so given the fact that Brock is the law, the sale alone of a commercial quality can't be the determinative factor, can it? No, but Your Honor, that's the point. Brock is the law with regard to... So tell me what the other evidence is. Tell me what the... Given the fact that you don't like Brock, but we're stuck with it, give me the other evidence that you have besides the $10,000 that shows that these two were cooperating with a singular purpose. What was the... Your Honor, it's the individual relationship, and here the court is stuck with Brock, just as I am, but the court is also... Three transactions over three months, the middle transaction of which was the result of a misdial by Mr. Pacheco to Mr. Garner, right? That's not entirely clear. I'm not sure of the fact of that, Your Honor. That's not what I... Okay. The government tried, when Mr. Pacheco was on the stand, which he was, the government tried over and over again to get him to testify to facts that would have supported the notion there was a conspiracy, and he kept refusing. He's a cooperator, and he kept refusing to give the evidence that would have easily put this over the goal line. He just kept saying no. Isn't that right? No, I disagree, Your Honor. In this case, we had the evidence of... We had the cooperator testifying to significant transactions in a short period of time, kilogram quantities, what he testified to. That, Your Honor, again, is a conspiracy, and what we're trying to do here is where we have... Yes, we do have Brock, but we also have this court's holdings in United States v. Parker, which is cited in my brief when we look at the individual circumstances. So with regard to Brock, again, as I said, Brock was somebody who was being looped into a much larger conspiracy. He was somebody who was buying from multiple sources. Here, we only have Mr. Garner buying from Mr. Pacheco, and that's it. We have Mr. Garner being held accountable for his agreement with Mr. Pacheco to sell cocaine and to sell it in increasing amounts. Mr. Garner didn't know who Mr. Pacheco was buying from. Mr. Pacheco didn't know who Garner was selling to. But that's well-established law of this court, which is also bound by the desire... I guess my problem... My problem is you keep talking about... My problem is you keep talking about kilograms, and the jury told you less than 500 grams. The kilogram quantity... I don't know how you... Excuse me. I don't know how you escape that. How do you escape that? You keep talking about kilogram amounts, but that's not what the jury found. But respectfully, Your Honor, that is not an element of conspiracy. Quantity is simply not an element of conspiracy. So when the jury was asked how much, that was a different analysis that the jury was conducting. The jury, at the initial point with that, was there a conspiracy? And they found yes, there was, despite having been given the buyer-seller exception instructions in the record at 856 to 858. They were clearly properly instructed. So at step one, they found conspiracy. They found buyer-seller instruction inapplicable. Then step two, what was the quantity involved? They came up with an amount. We don't know, again, we don't know why they came up with that amount, how they came up with it, what specific amount less than half a kilogram they found. But again, the initial buy, the initial even just that two to four ounces is sufficient for finding that this was something more than a user... Well, we can't... We also can't conclude that they made any conclusion that the next two buys didn't happen. All we know is that they came to a quantity amount of less than 500 grams. Drawing the... Looking at the evidence and drawing all inferences in favor of the jury verdict, there were three transactions. Am I right in understanding that's how we would look at it? Yes, Your Honor. Now, Ms. Richards, I think your time has expired. Do you want to use some rebuttal time now or would you want to reserve it? May I proceed? Yes, Mr. Irwin. May it please the court. The dismissal of the conspiracy count was correct and completely supported by this court's president. Essentially, as this panel has recognized, the government asked the court to overrule Brock. Brock is not... It is the law in this circuit, but it's consistent with cases in other circuits as well. Well, aren't we supposed to look at the individual facts of each case? I mean, that's clear in our case law. And this case is not quite on all fours with Brock, is it? I think actually the facts are stronger here than in Brock, particularly in light of the jury's findings. You know, the government keeps on referring to kilogram quantities. Do you... The panel has recognized there were not kilogram quantities as found by the jury. There was... Between one and three transactions, the first one we know TECA testified was between two and four ounces. But here... But you're not arguing that an amount less than 500 grams could not be a distribution quantity. I mean, 499 grams is well over any distribution quantity, right? Correct, Judge Wilson. The fact that it was... I mean, even if it was kilogram quantities, the government's argument seems to be that quantity is the determinative factor. No, I think... And I'm interrupting because I'm just trying to make sure I understand your argument in the application of Brock. But no, it's not just the quantity they're relying on. They're relying on evidence of the quantity, evidence of three transactions, which, as far as I can see, it's not correct to say that we can only look at the first transaction. You have to look at all three because the jury was presented with that evidence and in no way suggested it wasn't finding three transactions. And in addition, there is this payment of bail money, which is evidence of mutual dependence of the two, of Mr. Garner and Mr. Pacheco. But tell me why, looking at all that, the jury wasn't entitled, having been instructed that without more than mere existence of a buyer-seller relationship is insufficient to establish membership in a conspiracy. Why wasn't it entitled to make a judgment that this was a conspiracy? So addressing each of those points, with respect to the number of transactions, yes, the panel may be bound by the jury's finding that there were three transactions, those three transactions were completely ad hoc. The first transaction, it happened since Garner happened to be in the Cousin's house. The next time, it was a random call that he called him up, do you need anything? There was nothing light in Brock. The evidence was that on a weekly basis, several days a week, he would call him for April transactions. And even when they engaged in the transaction here, according to the testimony, he told me he wanted a kilogram, he didn't even believe him. So there was not this sort of mutual trust and standardized feeling. Pacheco, his testimony was similar to in Brock, he said he didn't understand why Garner was on the case with him.  informing him that Garner had lack of involvement and he referred to Garner as a customer. There was no limitation, he testified no limitation as to what Garner could do with this product. He said he didn't care what he did with these drugs. This is unlike these other cases by this court where it upheld, where the court found that there was a continued interest in the sale, the seller took interest in how the sellers, how the purchasers were selling the drugs, what they were doing. Here there's nothing like that. The government says, oh the evidence, this is unlike Brock because Brock had multiple distributors and here this was the only distributor. That's not an accurate view of the evidence. What we do know, according to the government film theory, was that before the partner that they attributed to Garner was raided, he was obviously buying from somebody else. Pacheco then went to Puerto Rico, there was a gap of several weeks and during that time, presumably, Garner was still in business according to the government. Who was he getting from? It's obvious that he had, that Pacheco was not his only supplier. The government then says, well it was the bail money and it's obvious that he gave the bail money because he wanted to continue the business. That's not what, that's not what Pacheco testified. What Pacheco testified is he gave him the money and he says it was only $5,000. He said he gave him the money because he didn't want him cooperating. And as the district court found, yeah, that makes perfect sense because even if he wasn't involved in a conspiracy, he just, they may have been doing something illegal. Garner, according to the government, was a drug dealer and he didn't want Pacheco telling that to the government. That has nothing to do, there's no inference that he thought he was going to continue to purchase. Well, if it's evidence, help me understand this because I look at the bail money as it has to be evidence of conspiracy even if we, even considering Pacheco's testimony that, considering the testimony and the way you describe it. I mean, if there is a conspiracy, presumably you don't want your co-conspirator to cooperate. Is it still evidence of mutual dependence? Most certainly, Your Honor. There doesn't have to be a conspiracy for a customer. There doesn't have to be and I understand your argument. There doesn't have to be but here we're trying to draw all inferences in favor of the jury's verdict. So why wouldn't it still be an inference in favor of the jury's verdict? The bail money is indication of a mutual dependence.  mutual dependence for what purpose? It has to be mutual dependence for the purpose of, for a conspiratorial purpose. There's no evidence that it was for a conspiratorial purpose. It was that, listen, I'm a customer. I don't, I don't want somebody, the person who's telling to me, telling the government that I'm a drug dealer. That's not mutual dependence. That's not, that has nothing to do with the conspiratorial purpose. And I think when you examine the totality of the evidence, it just, it really doesn't add up to what's this court in Brock and Hawkins in all the cases have found this necessary. The government's position essentially is that the buyer-seller exception should be limited to people who use it for personal quantity, but simply not the law. And here, examining really every factor under Brock, I think it, it, it supports the district court's decision. There was no prolonged cooperation between the, between the parties. As far as the level of mutual trust, Pacheco testified he didn't trust, he didn't trust Garner and he, the evidence was that Garner really didn't trust him. He was when he was dealing because he was, he was worried that he would take his money and just run off with it. There's no standardized dealings. It was, it was all kind of on a, there was not, there was nothing standard about it. It was, you know, every so often he, not every so often, he, one time he called him, he asked him, he said, do you need more? That's not standardized dealings. That's not what was in Brock where they, on, on, on a weekly basis, he would, he would call him up. The other thing is, as the district court noted, you know, drug dealer, he didn't give Garner his new number when he would get one. He testified he would get a new number every week. He never gave it to him. He would give his real customers the ones that were, that he could bargain with. He would give them their own phone. He never gave that to Garner. So all of those facts, I think, and finally, there was no sales or credit. And so what we're left with here is just simply the quantity of drugs. And yes, the jury's finding permitted the difference up to a half a kilo, but it, it, it would be, you know, it just would be completely ignoring what, uh, Pacheco's testimony was. But even if it is that amount, I don't think that's different from any of the other cases. Brock, in this circuit, Polgar in the other circuit, there was a relationship there for 12 years in that case. But that's not enough. Now, wasn't there, I think, I read that, uh, in the government's brief that there was argument made at trial by the defense that, uh, overstating the drug quantities. Am I misremembering that? I, that's, I know that the government argued that the, the jury could have found that. That's not my recollection of what the evidence is, of what the evidence is and what the defense argument. But I didn't argue, I, I wasn't the trial lawyer. All right. But that's not my recollection. If the, if the court has no further questions, I, I would rest on my brace. Thank you very much. Thank you, guys. With regards to, I just wanted to start first. There is a misstatement by defense counsel with regards to whether or not the phone number was granted. And the record at, um, 698, uh, Mr. Pacheco, um, had been asked on cross about whether or not he provided his new phone numbers to, um, Mr. Garner. And then on redirect, he clarified that in fact, um, Mr. Garner's phone number did show up in a group of texts with regards to his phone. So we did have the new phone numbers that things went along. But with, in any event, besides that, uh, what I would like to say is that drawing all inferences in favor of the verdict, here we have two transactions. We have wholesale amounts. And when you consider that when they first met Mr. Garner, I'm sorry, Mr. Pacheco sold with cousins a couple grams, but he sold to Mr. Garner two to four ounces. What do we make of this testimony that, uh, of Mr. Pacheco, that I don't care what he did with the drugs. And there were no credit sales. You know, the testimony on the stand of the cooperator did seem detached from any interest in what happened after the sale took place. Just because I don't think that matters just like Mr. Garner did. He did   any        we've talked about the transaction where in fact you showed up at Mr. Garner's house. That's a level of trust and dependence that is mutual dependence. That is a relationship that goes beyond the mere seller or user-dealer relationship. We've had, frankly, a referred cost credit here in that regard, in that description. The, um, factor that what we had were inferences that, uh, were fair that the jury drew and regardless of whether or not the district court or this court disagreed with the way that  handled it, the jury was properly instructed to be instructed on this buyer-seller and they found between Mr. Pacheco and Mr. Garner to distribute fair credit. And that's all. With that, I'll rest on my brief unless there's further questions. Thank you, Ms. Richards. Thank you both.